UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------x
                             :
A.H. HARRIS & SONS, INC.,    :
                             :
          Plaintiff,         :
                             :
v.                           :   CASE NO. 3:14CV304(AWT)
                             :
TARALYNN NASO and HD SUPPLY  :
CONSTRUCTION SUPPLY, LTD.    :
d/b/a/ WHITE CAP CONSTRUCTION :
SUPPLY,                      :
                             :
          Defendants.        :
                             :
----------------------------x
```

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

The plaintiff, A.H. Harris & Sons, Inc. ("A.H. Harris"),
filed a motion for a preliminary injunction, seeking, inter
alia, to enjoin defendant Taralynn Naso ("Naso") from continuing
her employment with defendant HD Supply Construction Supply,
Ltd. d/b/a White Cap Construction Supply ("White Cap").  For the
reasons set forth below, the motion for a preliminary injunction
is being granted.

I.   FACTS

Naso was hired by A.H. Harris in 2004 as an administrative
assistant in its credit department.  Shortly after being hired,
Naso was promoted to the sales division.  Naso did well in the
sales division and was promoted to positions of increasingly
greater responsibility.  Until February 2010, she worked in A.H.

-1-

Harris offices in New Jersey.  In February 2010, Naso
transferred to A.H. Harris's Baltimore, Maryland branch office,
where her boyfriend, Manny Mimoso, was the Branch Manager; that
branch office had been opened in 2008.  In March 2013, Mimoso
resigned.  He went to work for White Cap.

In April 2013, Naso was offered the position of Branch
Manager at the Baltimore office.  Although the position was
offered to Naso in early April, and she ostensibly accepted it
when it was offered, the promotion was contingent on Naso's
execution of a Confidentiality and Non-Interference Agreement
(the "Agreement").  The Agreement included a number of
paragraphs restricting Naso's ability to solicit A.H. Harris's
customers, to accept employment with A.H. Harris's competition,
or to disclose information Naso learned while employed at A.H.
Harris if Naso's employment with A.H. Harris terminated.
Section 3(a) the Agreement states:

> The Employee covenants that she will not, for a period
> of two (2) years after termination of her employment
> with the [Plaintiff] for any reason, directly or
> indirectly, for whatever reason, whether for her own
> account or for the account of any third party,
> solicit, accept the business of or do business with
> any of the Corporation's customers, suppliers, or
> contractors (or anyone who has been a customer,
> supplier, or contractor of the Corporation during the
> five (5) year period prior to the termination of the
> Employee's employment), or any bona fide prospective
> customer, supplier, or contractor of the Corporation,
> where the business to be conducted with such party
> would compete with the products and services offered
> by the Corporation, and shall not otherwise interfere

> with the Corporation's customers, suppliers, or contractors (or anyone who has been a customer, supplier or contractor of the Corporation during the five (5) year period prior to the termination of the Employee's employment), or any bona fide prospective customer, supplier, or contractor of the Corporation.

(Agreement, Defs.' Ex. G, at ¶ 3(a).)  Additionally, the

Agreement contains a provision that reads:

> The Employee further covenants that she will not, for a period of two (2) years immediately after termination of her employment with the Corporation, for any reason, directly or indirectly, own, operate, manage or accept employment or a consulting arrangement with any company, firm or person doing business within a 100 mile radius of the Corporation's Baltimore, Maryland office that is engaged in business that is substantially similar to or competitive with any service or product of the Corporation, expressly including, but not limited to, White Cap Construction Supply, Inc. and/or HD Supply, Inc. and any related or affiliated company, parent company, or subsidiary of one or both of those two companies.

(Id. at ¶ 3(b).)  With respect to non-disclosure, the Agreement

states:

> The Employee agrees that, by virtue of the performance of Employee's normal duties with the Corporation, and by virtue of the relationship of trust between the Employee and the Corporation, Employee will possess and help create certain data and knowledge of operations of the Corporation that are proprietary in nature and confidential.  The Employee covenants that she will not, at any time, whether during the term of this agreement or otherwise, reveal to any person (other than the Corporation) or use on behalf of a third party or for her own account, any confidential or proprietary record, customer information or name, customer list, prospective customer information, pricing methodology, software or computer program, product or materials sourcing information, product information, route assignments, data, financial information, trade secret, pricing policy, method or

practice of obtaining or doing business by the
Corporation, or any other confidential or proprietary
information whatever (the "Confidential Information"),
whether or not developed by the efforts of the
Employee.  The Employee further covenants that she
shall retain all Confidential Information in trust for
the sole benefit of the Corporation.

(Id. at ¶ 2.)  With respect to breach, the Agreement provides:

It is expressly understood and agreed by the Employee
that: (i) rather than enter into a more comprehensive
non-competition agreement, the parties have
specifically tailored the restrictions set forth in
this Agreement so that they represent a reasonable and
necessary protection of the legitimate interests of
the Corporation; (ii) the Employee's failure to
observe and comply with this Agreement will cause
irreparable harm to the Corporation; (iii) the
consideration received for the restrictions is fair;
(iv) the restrictions will not deprive the Employee of
her ability to earn a reasonable living and the
Employee has skills which allow her to obtain
employment following her termination of employment
without violating this Agreement; (v) it will be
difficult to ascertain the extent of the harm to the
Corporation caused by the Employee's breach of this
Agreement; and (vi) a remedy at law for such breach by
the Employee will be inadequate.  Accordingly, it is
the intention of the parties that, in addition to any
other remedies which the Corporation may have in the
event of any breach of this Agreement, the Corporation
is irrevocably authorized by the Employee to demand
and obtain specific performance, including temporary
and permanent injunctive relief, without the necessity
of posting bond or other security, and all other
appropriate relief against the Employee in order to
prevent any breach or threatened breach by the
Employee of this Agreement. . . .  The Employee
knowingly and voluntarily enters into this Agreement.
The Employee has had the opportunity to retain legal
counsel to assist her prior to the execution of this
Agreement.

(Id. at ¶ 5.)  The Agreement is governed by Connecticut law.

-4-

Upon receiving the Agreement, Naso expressed concern that if the Baltimore office were to close, the restrictive covenants in the Agreement would prevent her from earning a living. Although there was initially some discussion about changing the language to provide for the contingency of A.H. Harris closing the Baltimore location, A.H. Harris personnel ultimately decided that they would not modify the Agreement. Naso signed the Agreement, unaltered, on April 16, 2013.

A.H. Harris then promoted Naso to Branch Manager, increased her salary by $10,000 ($5,000 initially and $5,000 approximately 90 days later) to approximately $53,000, and made her eligible for year-end bonuses through the company's incentive plan for management-level employees. As Branch Manager, Naso received confidential information about A.H. Harris's business, which included financial reports, daily profitability reports, monthly profit and loss statements, monthly sales projections, projected monthly earnings before interest, taxes, depreciation and amortization (EBITDA), annual budgets, reports from the company's corporate strategy dashboard, and the A.H. Harris pricing matrix, which the company used to calculate the prices it charged customers for products based on characteristics of the customer purchasing the product.

The Baltimore market for construction material distribution, A.H. Harris's business, is extremely competitive,

and the profit margins in that particular region are narrower than those in other areas of the country.  A.H. Harris concluded in November 2013 that it could no longer afford to keep its Baltimore branch office open, and that it was more profitable to service the Baltimore market from its branch offices in Virginia.  A.H. Harris announced on November 19, 2013 that it would be closing the Baltimore office, effective immediately, and consolidating it with its Richmond, Virginia office.  As a result of this consolidation, Naso's position was eliminated and her employment with A.H. Harris was terminated on November 22, 2013.

In response to the impending termination of her employment, Naso reached out to a number of A.H. Harris employees, including the president, Kimberly Corwin ("Corwin"), and asked to be released from the restrictive covenants in the Agreement. Corwin responded to this request, in part, by sending an email that reads:

> As I stated there would be certain portions of the Non-[]Interference Agreement that would remain in effect; customer information, pricing, confidential company information etc.  I have no issue modifying the agreement to allow you to work for Vimco or Kaufman.  If you are considering White Cap there would be geographical limitations, outside our footprint. . . .

(Email from Kim Corwin to Taralynn Naso, dated November 20, 2013, Defs.' Ex. X.)

-6-

A.H. Harris also attempted to persuade Naso to stay with
the company, and offered her several different positions in
various branch offices in New England and New Jersey.  In
addition to its own employment offers, A.H. Harris assisted Naso
in securing offers from two other companies in Maryland: Vimco
and Kaufman.  Naso received an offer from Vimco at its Savage,
Maryland location (about 20 miles from downtown Baltimore) for
$65,000 per year plus benefits, and from Kaufman at its
Baltimore location for $45,000 per year without benefits.
Corwin testified that A.H. Harris was comfortable releasing Naso
from her obligations under the Agreement if she went to work for
Vimco or Kaufman because they are primarily suppliers for A.H.
Harris, rather than competitors.

Ultimately, Naso accepted a position with White Cap in its
Baltimore office as an inside account manager for a salary of
$60,500.  The offer letter sent by White Cap to Naso included a
provision regarding Naso's obligation not to disclose A.H.
Harris's proprietary information:

> You understand that it is not the intention of [White
> Cap] to receive or obtain any trade secrets of others.
> Accordingly you will not disclose or use during the
> period of your employment any proprietary information
> or confidential information which you may have
> acquired because of employment with an employer other
> than HD Supply. You will not bring [White Cap] any
> documents in any form containing proprietary or
> confidential information from a prior employer.

(Defs.' Br. on Enforceability of Restrictive Covenant (Doc. No. 27) ("Defs.' Br."), at 9.)  Since being employed by White Cap, Naso has worked with customers she worked with while employed by A.H. Harris, including Greenstreak, Inc. ("Greenstreak").  Both Naso and Kevin Burns ("Burns"), the manager of White Cap's Baltimore office, maintained at the hearing that all of the customers to which Naso provided a quote or made a sale were existing White Cap customers at the time Naso was hired by White Cap, and that she has not shared any of A.H. Harris's confidential information with White Cap.

## II.   LEGAL STANDARD

In Connecticut,

> [t]he standard for granting a temporary injunction is well settled. . . . A party seeking injunctive relief must demonstrate that: (1) it has no adequate remedy at law; (2) it will suffer irreparable harm without an injunction; (3) it will likely prevail on the merits; and (4) the balance of equities tips in its favor.

Aqleh v. Cadlerock Joint Venture II, L.P., 10 A.3d 498, 506 (Conn. 2010).  "The plaintiff seeking injunctive relief bears the burden of proving facts which will establish irreparable harm as a result of" the defendants' actions, and "[a]lthough an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." Karls v. Alexandra Realty Corp., 426 A.2d 784, 789 (Conn. 1980).

III. DISCUSSION

The complaint contains four claims: (i) breach of contract against Naso; (ii) violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 et seq., against Naso; (iii) tortious interference against White Cap; and (iv) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq., against both defendants.

A.   Enforceability of the Agreement

The defendants advance three arguments why the Agreement is not enforceable: fraud in the inducement, denial of promised consideration, and unreasonableness of the restrictive covenants.  In Connecticut, "[a] party challenging the enforceability of a restrictive covenant has the burden of proving that the covenant is not enforceable." Sagarino v. SCI Connecticut Funeral Services, Inc., No. CV 000499737, 2000 WL 765260, at *3 (Conn. Super. May 22, 2000); see also Mathis v. Lally, 82 A.2d 155, 156 (Conn. 1951).

1.   Fraud in the Inducement

The defendants argue that, after Naso had informed A.H. Harris that she did not want to agree to the restrictive covenants, A.H. Harris fraudulently induced Naso to sign the Agreement, and in particular to agree to the unaltered restrictive covenants, by representing to her that it was not

considering closing the Baltimore branch office when in reality it was considering doing so.

In Connecticut, "[f]raud in the inducement to enter a contract is a well established equitable defense." Connecticut National Bank v. Voog, 659 A.2d 172, 179 (Conn. 1995). "In order to sufficiently plead fraud as a special defense, all of the elements of a cause of action in fraud must be alleged." Beckenstein v. Naier, No. HHDCV085019254S, 2010 WL 4885648, at *8 (Conn. Super. Ct. Nov. 4, 2010). These elements are:

> (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to [her] injury.

Maturo v. Gerard, 494 A.2d 1199, 1201 (Conn. 1985); see also Barasso v. Rear Still Hill Road, LLC, 842 A.2d 1134, 1139 n.3 (Conn. 2004). Furthermore, a claim of "[f]raud by nondisclosure 'expands on the first three of [the] four elements [and] involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak . . . .'" Statewide Grievance Committee v. Egbarin, 767 A.2d 732, 738 (Conn. App. 2001) (quoting Parker v. Shaker Real Estate Inc., 705 A.2d 210, 213 (Conn. App. 1998)) (alterations and emphasis in original). However, a "party asserting such a [defense] must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance

-10-

of the evidence, which higher standard [the Connecticut Supreme Court has] described as 'clear and satisfactory' or 'clear, precise and unequivocal.'"  Weisman v. Kaspar, 661 A.2d 530, 534 (Conn. 1995) (quoting Rego v. Connecticut Ins. Placement Facility, 593 A.2d 491, 494 (Conn. 1991); Kilduff v. Adams, Inc., 593 A.2d 478, 485 (Conn. 1991)).

In support of their contention that A.H. Harris falsely represented to Naso that it was not considering closing the Baltimore office, the defendants emphasize a telephone conversation between Naso and Corwin on April 15, 2013, and certain emails by and among A.H. Harris employees as early as March 28, 2013 and as late as September 17, 2013.  However, the evidence shows that during the period preceding Naso's execution of the Agreement on April 16, 2013, and continuing for a time thereafter, A.H. Harris was evaluating the Baltimore office, and the person charged with evaluating that office concluded on April 15, 2013 that a better physical location in Baltimore was the solution.  Also, the representative of A.H. Harris with whom she dealt in connection with the Agreement told her that he could not predict what might happen in the future, and the president of A.H. Harris only committed to not preventing Naso from earning a living and to A.H. Harris not having any intention of exiting the Baltimore market.

On March 28, 2013, Naso's predecessor as Branch Manager, her boyfriend Mimoso, announced his resignation, and correspondence between Corwin and others at A.H. Harris reflected that they believed that they had to make a decision with respect to Baltimore.  Bruce Wardwell, Director of Sales, after asking whether Naso would be leaving with Mimoso, commented "[m]akes decision on Balt easier."  (Email from Wardwell to Corwin, et al., dated March 28, 2013, Defs.' Ex. B.) The next day, Corwin, the company's president, shared her thoughts about the process for evaluating the Baltimore office. She wrote, with respect to the vacancy in the position of Branch Manager: "[i]t gives us time to adequately analyze the situation in Baltimore - do we stay or do we go?  Just added a new AM - could be turning point.  Perhaps landlord would agree to 1 year extension if we are gaining ground -- more time to assess[.]" (Email from Corwin to Wardwell, et al., dated March 29, 2013, Defs.' Ex. C.)   She also noted: "[e]ven if we close Baltimore, Tara could have a future with A.H. Harris as an RA."  Id.  At the end of the message, Corwin stated that "[w]e should review in 30 days, 60 days, 90 days."  Id.

On April 15, 2013, Naso had her conversation with Corwin, in which Naso expressed concern about her ability to make a living if the Baltimore office were to close.  Corwin informed Naso that A.H. Harris had no intention of exiting the Baltimore

-12-

market and that Naso did not need to worry about that.  Also, on

April 15, 2015, Corwin received a report from Raymond DeWitt,

A.H. Harris's Corporate Operations Manager, who had just spent

two weeks in Baltimore observing the operation at the branch

office.  He reported on two new employees who had been hired for

the branch office -- he thought would both work out very well.

He recommended hiring one more person in the warehouse, and he

reported the following with respect to the location of the

office:

> Branch Location - I know there has [been] some talk
> about closing and whether the need exists for us to
> have a location in Baltimore. While the walk in
> traffic is almost nonexistent the volume of work being
> done in the area is unbelievable. I think that a
> better physical location is the solution, and I think
> that the 2 AM's can give us the best advice on where
> we need to be located.

(Email from Dewitt to Corwin and Kevin LeStourgeon (Division

Manager of A.H. Harris's Southeast Region), dated April 15,

2013, Defs.' Ex. N.)

On April 16, 2013, Vance Harris, Director of Human

Resources for A.H. Harris, who had also received the report from

DeWitt, spoke with Naso about concerns Naso had about the

restrictive covenants.  Prior to speaking with Harris, Naso had

talked with Corwin and Kevin LeStourgeon.  Corwin was receptive

to modifying the language in the Agreement.  Corwin wrote to

Harris concerning Naso: "She wants assurance that IF AH Harris

pulls out of the Baltimore market or closes the Baltimore
location, she can still make a living.  Ie: go to work for the
competition if necessary -- Seems like a fair request[.]"
(Email from Corwin to Harris and LeStourgeon, dated April 15,
2013, Defs.' Ex. K (emphasis in original).)

    LeStourgeon, who was included on this email, was also
receptive to changing the language in the Agreement. He informed
Harris that Naso was "going to write in verbiage pertaining to
AHH exiting the Baltimore market . . . ." (Email from
LeStourgeon to Corwin and Harris, dated April 15, 2013, Defs.'
Ex. K.)  However, Harris disagreed with Corwin and LeStourgeon.
He told Corwin, his superior, that the language would not be
changed.

    Harris subsequently talked to Naso.  Naso expressed her
concern about the language in the Agreement. Harris spoke to
Naso about the growth of the Baltimore market, trying to
reassure her that it was A.H. Harris's intent to continue to
grow that market.  He explained what had happened when A.H.
Harris closed another market, in Lakeland, Florida; when A.H.
Harris left that market, it made sure that everyone had a job.
He used A.H. Harris's experience in Lakeland as an example of
things that A.H. Harris would do to make sure there was an
opportunity for all of its employees if it left the Baltimore
market.  Harris told Naso that while it was not the company's

intention to prevent her from earning a living, he could not "predict what might happen in the future and put it into writing." (Tr. at 71).  He made it clear to her that he would not be changing the language.  Based on her testimony, the court concludes that Naso understood that Harris was advising her that "nobody [could] predict the future" and that "[i]f they did decide to leave the market, you know, retake a look at it and I was reassured again that they weren't going to leave the market and that was it." (Tr at 125-26).

On the other hand, by September 2013, A.H. Harris was contemplating closing the Baltimore office.  But it was also considering relocating to a smaller facility in Baltimore, which it would be able to accomplish by moving some of the items that were on-site in Baltimore to Roanoke.  LeStourgeon wrote the following in an email:

> "I started looking at some real estate on line and we should be able to get into a 12k [square foot] building in a desirable area in NOVA for $114k NNN. This is less than half [of what] we are currently paying (but smaller sf). . . . Baltimore is on track to lose ($100K) in EBITDA in 2013.  By relocating to a smaller facility and moving forms to Roanoke we save . . . . $153,000[.]"

(Email from LeStourgeon to Corwin, dated September 17, 2013, Defs.' Ex. P.)

Thus, at the time Naso signed the Agreement on April 16, 2013, Naso had discussed with three people at A.H. Harris her

concerns about A.H. Harris closing the Baltimore office or exiting the Baltimore market, and requested that the language in the Agreement be revised. She had ultimately been informed by Harris, the person who dealt with her with respect to the Agreement on behalf of the company, that the language would not be changed because the company could not predict what would happen in the future.   Thus, A.H. Harris did not represent to Naso that it was not considering closing the Baltimore branch office, knowing that the representation was untrue.

Rather, A.H. Harris represented to Naso that if A.H. Harris pulled out of the Baltimore market, A.H. Harris would take a look at the situation at that time, and it assured her that if that happened it would make sure there was an opportunity for her.  A.H. Harris's conduct after the Baltimore office was closed was consistent with this representation.  A.H. Harris also represented that it had no intention of exiting the Baltimore market.  A.H. Harris's conduct after the Baltimore office was closed was also consistent with this representation.

The defendants also contend that A.H. Harris employees misled Naso by failing to make a "full and fair disclosure" of all the facts known to them at the time. However, the defendants have not shown by clear and satisfactory evidence that A.H. Harris failed to make a full and fair disclosure of known facts concerning closing the Baltimore branch office.  The evidence

-16-

shows that in September 2013, A.H. Harris was contemplating closing the Baltimore branch office, though it was exploring the option of moving the location of the branch office.  During April 2013, however, while there had been talk of closing the Baltimore branch office, the most accurate description of the state of A.H. Harris's knowledge was that there was a risk that the branch office would close.  Naso, too, was aware of this risk.  As the defendants state in their brief, "Naso raised the possible closing of the Baltimore office as her one concern about signing the Agreement" with at least Corwin, Harris and LeStourgeon.  (Defs.' Br., at 16.)  Thus Naso was not misled.

Therefore, the defendants have not established clearly and unequivocally that A.H. Harris's employees made any knowing misrepresentation to Naso or knowingly failed to make a full and fair disclosure.

### 2.   Denial of Promised Consideration

The defendants contend that the Agreement is not enforceable because bargained-for consideration, specifically the possibility of Naso receiving a year-end bonus based on branch office performance, was withdrawn before Naso could take advantage of it.

A similar claim was at issue in Gartner Group Inc. v. Mewes, No. CV91 0118332 S, 1992 WL 4776 (Conn. Super. Jan. 3, 1992).  The defendant in Mewes "was asked to sign a

-17-

'confidentiality agreement' in return for which the plaintiff agreed to place $36,000[] in a tenure fund for the defendant's account.  This fund was to be paid to the defendant on March 31, 1993 provided he signed the 'confidentiality agreement' and adhered to its terms."  Id. at *1.  This "confidentiality agreement" contained a covenant not to compete.  Then, "[i]n April 1991 the plaintiff reorganized the defendant's department for budgetary reasons and eliminated his job."  Id.  The defendant was offered another job with the plaintiff, but he turned it down and went to work for a competitor.

 The defendant in Mewes claimed that since he was not given the $36,000 up front, the restrictive covenant was not supported by good consideration and was therefore unenforceable.  The court disagreed, stating:

> "a promised performance expressly conditioned upon the
> happening of an uncertain future event is sufficient
> consideration for a counter-promise.  If the event
> fails to happen the promise is performed with no
> resultant detriment or benefit, yet the chance that
> the condition may happen involves sufficient
> possibility of detriment to constitute consideration .
> . . ."

Id. at *2 (quoting Simpson on Contracts, 1954 Ed. at 89).  In addition, the court in Mewes noted: "Nor does a termination of employment at the initiative of the employer render the non-competitive provision invalid . . . ."  Id.

-18-

Similarly, in Daniel V. Keane Agency, Inc. v. Butterworth, No. 31 31 81, 1995 WL 93387 (Conn. Super. Feb. 22, 1995), the court found that a restrictive covenant was supported by adequate consideration where "[u]nder the new system, [the defendant] earned much larger commissions and he was eligible to earn larger bonuses", even though the defendant was terminated five months after signing the non-compete agreement.  Id. at *1. Thus, while the defendant in Butterworth never received the larger bonus he expected to collect, and received only a small portion of the increased compensation he expected, the court held that "'[a]n exchange of promises is sufficient consideration to support a contract.'" Id. at *7 (quoting Osborne v. Lock Chain Co., 218 A.2d 526, 531 (Conn. 1966)). Moreover, in addition to the fact of the opportunity for a bonus, the court in Butterworth held that "[w]hen the terms of employment change, new obligations and responsibilities will support a promise not to compete." Id.

Here, Naso received consideration other than the opportunity for the year-end bonus, including a promotion and an increase in salary.  Naso also received increased responsibility, which Naso testified was one of the reasons she was interested in the position, with the attendant access to A.H. Harris's trade secrets and proprietary information. Moreover, with respect to the year-end bonus, Naso received the

-19-

consideration that was promised: an opportunity to participate
in the program.  As the offer letter provided to Naso makes
clear, this bonus payment was not guaranteed and was contingent
on a number of factors, including being "actively employed by
A.H. Harris at the time of any payout . . . ."  (Pl.'s Ex. 7, at
4.)

    Therefore, while it was A.H. Harris's decision to eliminate
Naso's position, ultimately rendering her unable to receive any
bonus payment, its promise to consider her eligible for such a
payment would have been, standing alone, sufficient
consideration for her promise not to compete; in fact it was not
the only consideration.  As the Connecticut Supreme Court has
noted, "[t]he doctrine of consideration does not require or
imply an equal exchange between the contracting parties" and
"[t]he general rule is that, in the absence of fraud or other
unconscionable circumstances, a contract will not be rendered
unenforceable at the behest of one of the contracting parties
merely because of an inadequacy of consideration."  Osborne, 218
A.2d at 552-53.  As discussed above, the court finds that there
was no fraud in the execution of the Agreement.  The court also
finds that the circumstances surrounding the termination of
Naso's employment are not otherwise unconscionable.  Thus, the
defendants have not established that the contract is
unenforceable based on a lack of consideration.

### 3.   Unreasonableness

The defendants' final argument on unenforceability is that the covenant not to compete unreasonably restricts Naso's ability to earn a living.  When evaluating the reasonableness of covenants not to compete, Connecticut courts look to five factors: "(1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests." Robert S. Weiss & Associates, Inc. v. Wiederlight, 546 A.2d 216, 219 n.2 (Conn. 1988); see also Scott v. Gen Iron & Welding Co., 368 A.2d 111 (Conn. 1976).  These criteria are "disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." New Haven Tobacco Co., Inc. v. Perrelli, 559 A.2d 715, 717 (Conn. App. 1989).

### a.   Length of time and geographic area covered

Ordinarily, under Connecticut law, "time and geographical restrictions are to be reviewed as intertwined considerations", meaning, for instance, that "[a] restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might be reasonable for a longer time." Van Dyck Printing Co. v. DiNicola, 648 A.2d 898,

902 (Conn. Supp. 1993).  However, this is not the case with
every restrictive covenant.  For example, Connecticut courts
have described certain covenants as "antisales" restrictions,
characterizing such restrictions as those that "prevent[] the
employee from transacting business with only a specified group
of consumers, namely, the customers of the former employer."
New Haven Tobacco Co., 559 A.2d at 717.  These are contrasted
with "anticompetitive" restrictions that "restrict[] an employee
from engaging in the same business as the employer in a given
geographical area and prohibit[] the employee from doing
business with all consumers of the service located in that
area."  Id.  With respect to antisales restrictions, Connecticut
courts have held that they are "by [their] nature limited to a
definite geographic area.  The geographic area affected by an
antisales covenant is limited to that area in which the
customers of the former employer are located, and the
restriction, even within that area, applies only to those
customers."  Id.  Therefore, an antisales restriction can be
reasonable even if it fails to specify a geographic area,
whereas an anticompetition restriction will ordinarily require a
geographical limitation in order to be reasonable.

     Here, there are two aspects of the restrictive covenant in
the Agreement that are pertinent: First, ¶ 3(a), which prohibits
Naso, "for a period of two (2) years after termination", from:

> solicit[ing], accept[ing] the business of or do[ing] business with any of [A.H. Harris's] customers, suppliers or contractors (or anyone who has been a customer, supplier or contractor of [A.H. Harris] during the five (5) year period prior to the termination of [Naso's] employment), or any bona fide prospective customer, supplier, or contractor of [A.H. Harris], where the business to be conducted with such party would compete with the products and services offered by [A.H. Harris];

and second, ¶ 3(b), which prohibits Naso, "for the period of two (2) years immediately after termination", from:

> own[ing], operat[ing], manag[ing], or accept[ing] employment or a consulting arrangement with any company, firm or person located or doing business within a 100 mile radius of [A.H. Harris's] Baltimore, Maryland office that is engaged in business that is substantially similar to or competitive with any service or product of [A.H. Harris] . . . .

(Agreement, Defs.' Ex. G, at ¶¶ 3(a)-3(b).) Thus the Agreement contains both an antisales and an anticompetition restriction, each limited to two years, with the anticompetition restriction also limited to a 100 mile radius.

As the plaintiff points out, Connecticut courts have upheld restrictive covenants, both antisales and anticompetitive, lasting two years or more on multiple occasions. See, e.g., Wiederlight, 546 A.2d at 220 (two years without geographic limitation); Scott, 368 A.2d at 114 (five years with geographic limitation); Torrington Creamery v. Davenport, 12 A.2d 780, 783 (Conn. 1940) (two years with geographic limitation). The cases cited by the defendant, in which a two year restriction was held

to be unreasonable, are distinguishable from the facts here.
For instance, in Century 21 Access Am. V. Lisboa, No.
CV03081901, 2003 WL 21805547 (Conn. Sup. July 22, 2003), there
was testimony that the business's "average customer listing
last[ed] only six months" and the plaintiff's "office received
little repeat business.  Thus, after six months, the clients
that were on the lists when the defendant was terminated would
likely no longer be clients of the plaintiff."  Id. at *10.
Also, although the court found two years to be too long, it
refused to find the entire restrictive covenant unreasonable,
and instead amended it to last only one year.  The court found
that this amount of time would "protect the plaintiff's interest
in its present clients . . . . [and] adequately protect the
plaintiff's interest in [the] future clients" that the defendant
may have been aware of.  Id. at *11.  Similarly, in Cost
Management Incentives, Inc. v. London-Osborne, No. CV020463081,
2002 WL 31886860 (Conn. Sup. Dec. 5, 2002) the court
specifically stated that "[i]n light of the fast moving nature
of the biotechnology market, as described in testimony, two
years is not necessary for the plaintiff to secure its position
to withstand competition from the defendants."  Id. at *6
(emphasis added).

   Here, the building materials distribution market is not
characterized as "fast moving", or as one where there is an

unusually small number of repeat customers.  Rather, the
evidence presented by both sides suggests that building
materials distributors develop long-term relationships with
clients and customers, and that individual projects or deals can
last for up to several years.  Thus, the defendants have not
carried their burden of showing that the two year limitation, on
its own, is unreasonable.

However, the defendants argue that the two year limitation
is in fact unreasonable in the context of the antisales
restriction because the wording of ¶ 3(a) is broader than the
antisales restrictions that have been upheld in other cases, and
"the set of customers, suppliers and contractors covered does
not have the narrow 'natural' geographic limit as the equivalent
sets in New Haven Tobacco Co. and [Wiederlight]."  (Defs.' Br.,
at 36.)  In New Haven Tobacco Co., the court found that a
covenant not to "directly or indirectly sell products similar to
those of the Employer to any of the customers that he has dealt
with or has discovered and become aware of while in the employ
of the Employer for a period of [two years]", which did not
contain a geographical limitation, was not unreasonable where
the plaintiff's market was "local and limited to the greater New
Haven area."  New Haven Tobacco Co. v. Perrelli, 559 A.2d 715,
717-18 (Conn. App. 1989).  In Wiederlight, the court affirmed a
holding that a covenant that barred the defendant for two years

from soliciting accounts held by the plaintiff at the
termination of the employment agreement, without geographic
limitation, was not unreasonable where the plaintiff did
business throughout Fairfield County and in New York because,
"[u]pon the termination of the agreement, the clause fixed the
geographical scope of the covenant to a definite and limited
area." Robert S. Weiss & Associates, Inc. v. Wiederlight, 546
A.2d 216, 220 (Conn. 1988).  As an initial matter, while the
defendants are correct that A.H. Harris operates from Maine to
North Carolina and the limitations in ¶ 3(a) could "potentially
cover[] essentially all contacts with [A.H. Harris's customers,
suppliers, and contractors] even where Naso did not seek them
out or where they had existing and pre-existing relationships
with her new employer", the antisales restriction in this case
is not unreasonable merely because it is more restrictive than
two antisales restrictions that have been upheld in other cases.
The defendants' argument as to the two year limitation on the
antisales restriction in ¶ 3(a) is unavailing because they have
not shown that the antisales restriction is unreasonable under
the circumstances of this case.  The testimony from both sides
shows that Naso was and is working in a highly competitive
market with extremely narrow profit margins, in an industry
where both pricing and personal relationships are extremely
important.  In A.H. Harris's business, someone in management

would not only know about contracts for customers, but also
about suppliers.  Also, such a person would know what A.H.
Harris buys product for and be able to use that information to
his or her advantage.  It is reasonable for A.H. Harris to take
steps to prevent Naso, for a limited period of time, from using
her knowledge of its pricing structure and strategy, as well as
the relationships she developed as a result of working at A.H.
Harris, for White Cap's benefit.  This is true whether Naso is
bringing a new relationship to White Cap, or adding valuable
insight about a competitor in the context of a preexisting
relationship.

The defendants have also failed to demonstrate that the two
year limitation is unreasonable when taken together with the 100
mile radius in ¶ 3(b).  In support of their position, the
defendants merely cite to a number of cases where radii of less
than 100 miles have been held to be unreasonable, and discuss
Braman Chem. Enters., Inc. v. Barnes, No. CV064020633S, 2006 WL
3859222 (Conn. Super. Dec. 12, 2006), where the court's
"examination of the cases which have upheld radius-based
restrictions reveal[ed] that many of them involve non-competes
in connection with the sale of business."  Id. at *6.  However,
the defendants provide no persuasive explanation why, under the
particular factual circumstances here, a radius-based
restriction is unreasonable.  As the court observed in Trans-

Clean Corp. v. Terrell, No. CV97-034-80-39-S, 1998 WL 14236
(Conn. Super. Mar. 17, 1998), one of the cases relied on by the
defendants: "The geographic scope of a particular restrictive
covenant is not the deciding factor in finding a restriction
reasonable or not.  Rather, the general rule is that the
application of a restrictive covenant will be confined to a
geographical area which is reasonable in view of a particular
situation." Id. at *6 (citations omitted).  Indeed, under the
appropriate circumstances, the Connecticut Supreme Court found a
statewide restriction to be reasonable, see Scott, 368 A.2d at
115, and decisions in this district have upheld both a 100 mile
radius, see United Rentals (North America), Inc. v. Myers, No.
Civ. 3:03CV589(PCD), 2003 WL 23507021, at *3, and an area that
"encompassed most of the state of Indiana." United Rentals,
Inc. v. Frey, Civ. No. 3:10CV1628(HBF), 2011 WL 693013, at *6
(D. Conn. Feb. 18, 2011).  Here A.H. Harris has shown why two
years is a reasonable period to give the departed employee's
replacement to establish relationships with customers and
vendors.

     The defendants argue that the restriction is unreasonable
because it covers an area not effectively serviced by A.H.
Harris, citing Scott v. Gen. Iron & Welding Co., 368 A.2d 111,
115 (Conn. 1976) ("A restrictive covenant which protects the
employer in areas in which he does not do business or is

unlikely to do business is unreasonable with respect to area.")
Naso testified that when she worked for A.H. Harris at the
Baltimore office, she serviced customers in the Washington, DC
area, anywhere in Maryland with the exception of the Eastern
Shore, in Northern Virginia, and in Pennsylvania.  In describing
the Baltimore market as extending 100 miles from the Baltimore
office, Harris took into account the fact that the Baltimore
office was A.H. Harris's central point in that market -- a
location where it had a warehouse from which it was able to
service customers within 100 miles with its trucks.  Harris
testified that the 100-mile radius covered all of Washington,
DC, Baltimore, and Western Maryland, and parts of Northern
Virginia.  A.H. Harris continues to operate in and service that
market, notwithstanding the fact that its Baltimore office was
closed.[1]

    Further, although the defendants argue that as a result of
closing its Baltimore office, A.H. Harris's business operations
in the Maryland area have necessarily lessened, the evidence
shows that A.H. Harris is still very active in this geographical
area.  A.H. Harris is entitled to protect itself from unfair

---

[1] To the extent the defendants argue that because the Baltimore office has
been closed and ¶ 3(a) defines the 100-mile radius with reference to the
"Baltimore, Maryland office", the definition of A.H. Harris's Baltimore
market is rendered a nullity, the court finds that argument unpersuasive.  At
both the time the Agreement was entered into and the time Naso's employment
was terminated, there was a clear understanding by both parties as to what
A.H. Harris's Baltimore market was.

competition in areas where Naso was actually conducting business for it, see Wiederlight, 546 A.2d 221, and Naso has provided no argument as to why the 100 mile radius is unreasonable (beyond bald recitations of shorter, unreasonable radii in other cases). Therefore, the defendants have not carried their burden of showing that the time and geographical limitations of ¶ 3(b) are unreasonable.

> **b.   The fairness of the protection accorded to A.H. Harris**

Under the third factor,

> "restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights . . . . Especially if the employment involves . . . [the employee's] contacts and associations with clients or customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge."

Wiederlight, 546 A.2d at 221 (quoting May v. Young, 2 A.2d 385, 388 (Conn. 1938)) (alterations in original).  For substantially the reasons discussed above, the restrictions in ¶ 3(a) and ¶ 3(b) appear reasonably necessary for the fair protection of A.H. Harris's business.  It is fair for A.H. Harris to protect itself, in a highly competitive market with narrow profit margins and where both pricing and personal relationships are very important, from a former employee who has specialized knowledge of its internal strategy, pricing structure and

customer relations, and the restrictions in the Agreement seem reasonably tailored to do just that.

The defendants' arguments to the contrary focus primarily on the claim that Naso is not "bringing customers with her from the old to the new employer", since White Cap's and A.H. Harris's customers and suppliers overlap to a large degree, and that the restrictive covenants therefore are unreasonably overprotective because they target behavior beyond customer solicitation. (Defs.' Br., at 44.)  This argument, however, overlooks the nature of the harm A.H. Harris was most concerned about when it drafted these covenants, as well as the harm that has been shown here.  Harris testified that the company required Naso to sign the Agreement because it was concerned she would share confidential information with a competitor.  A.H. Harris has a legitimate concern about Naso being able to utilize her knowledge of A.H. Harris's inner workings to White Cap's benefit and A.H. Harris's detriment.  The fact that there is "a shared set of existing customers, suppliers and contractors" between A.H. Harris and White Cap (Defs.' Br., at 45) makes the restrictions at issue here more reasonable, not less so. Although Naso's offer letter from White Cap, taken at face value, prohibits her from using or disclosing in her employment any confidential information she obtained from A.H. Harris, and Burns and Naso testified that she had not done so, it is not

-31-

reasonable to require the plaintiff to rely on this letter to
protect its interests.

Further, the defendants' argument that since ¶ 2 deals with
confidential information then ¶ 3(a) and ¶ 3(b) cannot relate to
confidential information is unpersuasive.  As a Branch Manager,
Naso was exposed to a wealth of sensitive material that could
broadly be called "information", whether or not it would fall
into the definition of Confidential Information set forth in the
Agreement.  Such material could easily give Naso on behalf of
White Cap an unfair competitive edge over A.H. Harris whether
Naso consciously used the information or not.  Thus, contrary to
the defendants' characterizations, ¶ 3(a) and ¶ 3(b) are not
mere "antisoliciation" provisions and they do not unreasonably
overprotect A.H. Harris's interests.

>                 **c.   Extent of the restraint on Naso's ability to
>                 pursue her occupation**

In addition to considering the fair protection of the
employer, "[t]he interests of the employee [her]self must also
be protected, and a restrictive covenant is unenforceable if by
its terms the employee is precluded from supporting [her]self
and [her] family."  Scott, 368 A.2d at 115.  Under this
consideration, "[t]he test for reasonableness is not whether the
defendant[] would be able to make a living in other ways, or in
other occupations, but whether or not the Agreement as drafted

and applied would unfairly restrain [her] 'opportunity' to pursue [her] occupation." <u>Creative Dimensions, Inc. v. Laberge</u>, No. CV116020991, 2012 WL 2548717, at *5 (Conn. Super. May 31, 2012).

The defendants contend that the Agreement unreasonably restricts Naso's ability to pursue her occupation because the restrictive "language, while not crystal-clear, could be extended to cut Naso off from employment with any company in the business for which she was trained", and "the geographic area covered [is] so broad as to extend beyond even a broad definition of the area within commuting distance of Naso's Baltimore home." (Defs.' Br., at 48.)  However,

> [i]n considering the validity of noncompetition clauses in other contexts, [the Connecticut Supreme C]ourt repeatedly has observed that their validity is to be determined, not by the language in which they are couched, but by a factual inquiry into whether "they are reasonably limited and fairly protect the interests of both parties."

<u>Schoonmaker v. Cummings & Lockwood of Connecticut, P.C.</u>, 747 A.2d 1017, 1040 (Conn. 2000) (quoting <u>Wiederlight</u>, 546 A.2d at 220).  Along these lines, the court in <u>Grayling Assoc., Inc. v. Albert Villota</u>, No. CV040833521, 2004 WL 1784388 (Conn. Super. July 12, 2004) held that "[a]lthough the scope of restrictions imposed by the restrictive covenant taken literally [is] extremely broad, the plaintiff actually is seeking only to enjoin the defendant from competing in its own industry . . . .

This, the court deems reasonable and not unduly restrictive."
Id. at *2.

Here, the plaintiff and the defendants are in a similar situation as the parties in Grayling Assoc.  While the language in the Agreement could be literally construed to be extremely broad, the plaintiff is not seeking to prevent Naso from working in an only somewhat-related industry or for an employer with no solid connections to A.H. Harris's business.  Instead, the plaintiff is seeking to enjoin Naso from working with a direct competitor.  That direct competitor is the only competitor specifically mentioned by name in the restrictive covenants. Also, the reasonableness of the manner in which the plaintiff seeks to enforce these restrictions is underscored by the attempts made by A.H. Harris employees to find Naso other employment after the Baltimore branch office closed.  While the defendants point to these actions as evidence that the covenants are unreasonable, they actually demonstrate that A.H. Harris reasonably limited its own protections in an effort to accommodate Naso's interests.  A.H. Harris employees helped Naso to secure employment offers from other companies, and one of these offers was for higher compensation than what she was receiving at A.H. Harris or would receive at White Cap.

Therefore, this is not an instance where "the employee faced difficulty finding comparable employment with diligent

-34-

efforts" or where the "employee[] at issue . . . sought other
employment but [was] not successful in finding it." (Defs.'
Br., at 47-48.)  Instead, the restrictive covenants in the
Agreement represent a reasonable restraint on Naso, especially
when considered in light of how A.H. Harris sought to enforce,
or not enforce, the covenant at the time Naso's employment was
terminated.

> ### d.   The extent of interference with the public's
> ### interests

Under Connecticut law, in order for a restrictive covenant
to not unreasonably interfere with the public's interest, "it
first must be determined that the employer is seeking to protect
a legally recognized interest, and then, that the means used to
achieve this end do not unreasonably deprive the public of
essential goods and services." Perelli, 559 A.2d at 718.
Further, "[i]n determining whether a restrictive covenant
unreasonably deprives the public of essential goods and
services, the reasonableness of the scope and severity of the
covenant's effect on the public and the probability of the
restriction's creating a monopoly in the area of trade must be
examined." Id.

As discussed above, the court finds that A.H. Harris is
seeking to protect a legally recognized interest.  In addition,
enforcement of the restrictive covenants in the Agreement does

-35-

not pose a risk of granting A.H. Harris a monopoly over
construction material distribution in the Baltimore area.
Indeed, the testimony at the hearing demonstrated that this is
an area where there is a lot of competition, and preventing Naso
from working in the area will not at all deprive the public of
goods or services.

Therefore, the covenants are not unreasonable under the
final factor either.

### e. The effect of Naso's termination without cause on the reasonableness of the covenants

Although it is not a factor included in the <u>Scott</u> test for
reasonableness, the defendants have raised as an issue that the
covenants are rendered unreasonable because Naso did not
voluntarily leave her position with A.H. Harris, but her
employment was terminated without cause.  However, despite the
defendants' assertions to the contrary, the Connecticut Supreme
Court has stated that "the reasonableness of a restrictive
covenant of employment does not turn on whether the employee
subject to the covenant left [her] position voluntarily or was
dismissed by the employer."  <u>Wiederlight</u>, 546 A.2d at 221.
Therefore, the fact that Naso was laid off has no bearing on the
reasonableness of  ¶ 3(a) and ¶ 3(b).

Because the defendants have failed to demonstrate that the
restrictive covenants in the Agreement are unreasonable under

the five <u>Scott</u> factors, the court finds that the covenants are
reasonable and the Agreement is enforceable.

###    B.    The Availability of an Adequate Remedy at Law and the
            Likelihood of Irreparable Harm

Two of the four factors that the plaintiff must establish
to demonstrate that it is entitled to injunctive relief are that
it has no adequate remedy at law and that it will suffer
irreparable harm without an injunction.  As the analysis of
these two factors substantially overlaps under the circumstances
here, they are discussed together.

In evaluating motions for preliminary injunctions to
enforce covenants not to compete, the Connecticut Supreme Court
has held that "irreparable damage would inevitably result from a
violation of the defendant's promises." <u>Mattis v. Lally</u>, 82
A.2d 155, 157 (Conn. 1951).  Additionally, "[i]n the realm of
judicial review of restrictive covenants, a number of
[Connecticut] courts have held that a party who has demonstrated
that a covenant imposes a reasonable restraint has also met
their burden for demonstrating irreparable harm and inadequate
remedy at law." <u>Sylvan R. Shemitz Designs, Inc. v. Brown</u>, No.
AANCV136013145S, 2013 WL 6038263, at *10 (Super. Ct. Conn. Oct.
23, 2013) (collecting cases).  As a result of these decisions,
"[i]n Connecticut, appellate case law is not entirely clear, and
trial court decisions are divided as to whether [the

requirements of showing irreparable harm and no adequate remedy at law] are excused when temporary injunctive relief is sought based on the violation of a covenant not to compete." <u>Fairfield County Bariatrics and Surgical Assoc., P.C. v. Ehrlich</u>, No. FBTCV1050291046, 2010 WL 1375397, at *36 (Conn. Super. Mar. 8, 2010).  At the most, it appears that in Connecticut "irreparable harm and lack of adequate remedy at law are rebuttably presumed where a covenant not to compete which has found to impose only a reasonable restraint has been violated." <u>Id.</u> at *37; <u>see also POP Radio v. News America Marketing In-Store</u>, 898 A.2d 863, 871 (Conn. Super. 2005) ("Connecticut law supports a distinctly moderated level of proof required to establish the elements of irreparable harm and lack of an adequate remedy at law necessary for the issuance of a temporary injunction where the circumstances involve an alleged breach of a noncompetition agreement.")  As the court has found the restrictive covenants to be reasonable, it should apply the rebuttable presumption standard to evaluate the issues of irreparable harm and lack of an adequate remedy at law.

Here, the defendants have not sufficiently rebutted this presumption.  The defendants' arguments focus primarily on distinguishing the facts here from those present in <u>United Rentals, Inc. v. Frey</u>, Civ. No. 3:10CV1628(HBF), 2011 WL 693013 (D. Conn. Feb. 18, 2011), where the court found that the

defendant employee was soliciting and marketing to his former employer's customers, and asserting that A.H. Harris has not provided enough evidence that it risks losing customer goodwill or confidential information as a result of Naso's actions. However, these arguments ignore the effect of the presumption. A.H. Harris need not produce substantial evidence that it has already or likely will suffer irreparable harm; the fact that Naso is working for a direct competitor in this particular industry in this particular market is sufficient. Merely arguing that the facts in the present case differ from those in one of the many cases where the presumption was not rebutted is not sufficient to rebut the presumption. Finally, Naso agrees in the Agreement that its breach constitutes irreparable harm and that A.H. Harris has no adequate remedy at law for any such breach. In evaluating a restrictive covenant with similar language under Connecticut law, this court has stated that such an "'acknowledgment, if not an admission, is at least evidence and a recognition of the reality that money damages are not sufficient to remedy the loss.'" Frey, 2011 WL 693013, at *9 (quoting United Rentals, Inc. v. Bastanzi, No. 3:05CV596 (RNC), 2005 WL 5543590, at *8 (D. Conn. Dec. 22, 2005)).

Therefore, the plaintiff has demonstrated that it has no adequate remedy at law for a breach of the Agreement and will suffer irreparable harm without an injunction.

## C.   Likelihood of Prevailing on the Merits

The third factor Connecticut courts evaluate in considering a motion for a preliminary injunction is the likelihood that the plaintiff will prevail on its claims.  Here, although the plaintiff's complaint contains four claims, the court need only find that the plaintiff is likely to prevail on the merits of one of those claims to issue the preliminary injunction, provided that the claim is related to the irreparable harm the plaintiff is likely to suffer.

The plaintiff's first cause of action is against Naso for breach of the Agreement.  In Connecticut, "[t]he elements of a breach of contract action are 'the formation of an agreement, performance by one party, breach of the agreement by the other party and damages.'"  Rosato v. Mascardo, 844 A.2d 893, 902 (Conn. App. 2004) (quoting Bouchard v. Sundberg, 834 A.2d 744, 751 (Conn. App. 2003)).  As discussed with respect to the defendants' arguments against enforceability, the Agreement constitutes an enforceable contract and A.H. Harris performed its obligations under the Agreement.  Additionally, it is evident that Naso has breached the Agreement, particularly by her acceptance of employment with White Cap in the Baltimore area when White Cap is specifically identified in ¶ 3(b). Finally, the court has also already found that damage is likely to result from Naso's breach of the Agreement.

-40-

The defendants' arguments that A.H. Harris is not likely to prevail on this claim are not persuasive.  Their primary argument is merely a recitation and incorporation of their arguments regarding enforceability of the contract, and the court has found those arguments unpersuasive.  In addition, the defendants argue that A.H. Harris is unlikely to prevail on this claim because "it does not represent a genuine effort to prevent Naso from engaging in the actions that such covenants legitimately may restrain, but rather [p]laintiff's intention to 'send a message' to White Cap that future employment of [p]laintiff's former employees will be costly for it."  (Defs.' Mem., at 3.)  However, the standards for reasonableness of a restrictive covenant and for breach of a contract do not include as an element an examination of the motives behind attempting to enforce the covenant or contract; the defendants do not point to any case that holds otherwise.

Therefore, the court concludes that A.H. Harris is likely to prevail on its breach of contract claim against Naso. Moreover, this claim is closely linked to the irreparable harm that A.H. Harris will likely suffer absent a preliminary injunction.  Thus there is no need to discuss A.H. Harris's likelihood of prevailing on its other three claims.

D.    **The Balance of the Equities**

Finally, the court must balance the equities of granting the preliminary injunction versus denying it.

> "These considerations involve essentially the application of familiar equitable principles in the context of adjusting the rights of the parties during the pendency of litigation until a final determination on the merits . . . . Among the equities to be placed on the scales, of course, are the general equitable considerations which are involved in the issuance of a temporary injunction to preserve the status quo pendente lite."

Integrated Corporate Relations, Inc. v. Bidz, Inc., No. CV094028269S, 2009 WL 2962374, at *7 (Conn. Super. Aug. 14, 2009) (quoting Griffin Hosp. v. Commission on Hospitals and Health Care, 493 A.2d 229, 233-34 (Conn. 1985)) (alterations in original).

Here, even taking into consideration the fact that a preliminary injunction will disrupt the status quo--in that Naso will be enjoined from continuing her employment with White Cap-- the balance of the equities nonetheless favors finding for the plaintiff.  In addition to preventing any further irreparable harm that A.H. Harris is likely to suffer by Naso's continued employment with White Cap, a preliminary injunction will simply place A.H. Harris and Naso in the position in which they themselves contracted to be.  Upon her promotion to Branch Manager at A.H. Harris, Naso promised to not go to work for White Cap within 100 miles of the office A.H. Harris maintained

in Baltimore at the time, and the preliminary injunction will enforce this promise. Furthermore, to the extent that Naso argues that she was "forced" or "tricked" into accepting this promise without an understanding of what she was agreeing to, this argument is undercut by the testimony and other evidence showing that Naso originally attempted to get the non-compete covenant revised, but ultimately acquiesced to the language as written. Finally, as discussed above, although prohibiting Naso from working with White Cap will inevitably affect her employment, thereby causing her harm, the restrictive covenants are not unreasonable and do not prevent her from obtaining other, comparable employment.

Therefore, the only true harm to Naso is being required to fulfill her duties under the Agreement, and the only harm to White Cap is the loss of an employee it should not have hired. While the court does not minimize these harms, they are outweighed significantly by the harms to A.H. Harris discussed above. Thus, the balance of the equities favors issuing the preliminary injunction.

**IV. CONCLUSION**

For the reasons set forth above, the plaintiff's Motion for Preliminary Injunction (Doc. No. 4) is hereby GRANTED. The terms of the preliminary injunction are being set forth in a separate order.

-43-

It is so ordered.

Dated this 30th day of March 2015, at Hartford,

Connecticut.

                  _____/s/_____
                          Alvin W. Thompson
               United States District Judge
